McCANDLESS, Commissioner of Immigration, v. UNITED STATES, ex rel. PANTOJA et al.

No. 4134.

Circuit Court of Appeals, Third Circuit.

Oct. 24, 1930.

Calvin S. Boyer, U. S. Atty., and Charles Denby, Jr., Asst. U. S. Atty., both of Philadelphia, Pa., and Charles M. Bolich, of Allentown, Pa., for appellant.

Adrian Bonnelly, of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.

This case concerns the deportation of Avelino Pantoja, a native of Mexico, and his wife. After hearing a habeas corpus proceeding wherein he raised the question of the legality of his deportation, the court below discharged him from custody. Thereupon the Commissioner of Immigration took this appeal.

The facts are that Pantoja arrived in the United States from Mexico as a seaman on the steamship Monterey on October 3, 1919. He was duly examined by the United States officers at the port of New York, and was discharged from the vessel by the United States Commissioner.

Whatever may have been the status of the alien and his immunity from deportation had he remained in the United States is a question not before us. But the case turns, as we view it, on the subsequent acts of the alien in making numerous voyages as a seaman on various United States ships between New York, Mexico, and South American ports. His last trip was on the American steamship American Legion from New York to Buenos Aires where he did not disembark, from which trip he landed at New York on December 7, 1925, and was duly discharged December 7, 1925. On February 11, 1928, he was arrested, and on February 25th was ordered deported. The government contends that, no matter what his original status might have been, so far as deportation is concerned, his landing in New York on a voyage from the port of Buenos Aires on December 7, 1925, was an illegal entry into the United States.

We are constrained by the case of United States ex rel. Claussen v. Day, 279 U. S. 398, 49 S. Ct. 354, 73 L. Ed. 758, wherein the court said:

"The word 'entry' by its own force im-

plies a coming from outside. The context shows that in order that there be an entry within the meaning of the act there must be an arrival from some foreign port or place. There is no such entry where one goes to sea on board an American vessel from a port of the United States and returns to the same or another port of this country without having been in any foreign port or place. See sections 19, 32, 33, 35 [39 Stat. 874, 8 USCA §§ 155, 168, 169].

"And it is clear that petitioner departed from the United States on the Elisha Atkins and that, when he landed at Boston on his return from South American and Cuban ports, he made an entry into the United States within the meaning of the act."

It follows, therefore, that whatever may have been the original status of the alien, Pantoja, and what it might have been with reference to the statute of limitations had he stayed in the United States, it is clear that he departed from this country and went to a foreign port, and, when he returned from that foreign port to this country, it constituted an entry into the United States, and, as such, subjected him to deportation when the warrant of arrest was issued two years and a half thereafter.

We are constrained to reverse this case.